## McFarland v. Commonwealth.

(Decided June 12, 1925.)

### Appeal from Harlan Circuit Court.

1. **Homicide—Rejection of Testimony of Deceased's Impugning of Accused's Character for Virtue Held Not Prejudicial, in View of Verdict of Manslaughter.**—In murder prosecution where defense was self-defense against an alleged assault of deceased against accused when she charged deceased with having impugned her character for virtue and morality, rejection of testimony disclos-

ing remarks deceased made several days before homicide held not prejudicial, where verdict of manslaughter was returned, and where words could only enrage her and thereby reduce crime from murder to manslaughter.

2. Homicide—Evidence Held to Show Accused Shot Deceased, Not in Necessary Self-Defense, but Because of Some Other Motive.— Evidence held to show accused shot deceased, not in necessary self-defense, but because of some other motive.

W. A. BROCK for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

In the early part of the forenoon of September 7, 1923, in the mining town of Louellen, in Harlan county, Kentucky, the appellant and defendant below, Malinda McFarland, shot and killed Robert Collins. She was afterwards indicted and charged with murdering him and upon her trial was convicted of voluntary manslaughter and punished by confinement in the state penitentiary for ten years. Upon this appeal from the judgment pronounced on the verdict, after her motion for a new trial was overruled, her counsel argues but one alleged error which is: Erroneous ruling of the court in rejecting testimony offered by defendant. Before taking up that question and in order to have a proper understanding of it a brief statement of the facts as testified to by the witnesses for both sides is proper.

Deceased was working for a coal operator in the mining village, but was not at work on that day. He had arranged to go squirrel hunting with a companion and somewhere about 8:30 a. m. on the fatal day he was in front of and perhaps on the porch or platform of a commissary store operated by the mining company. Defendant came from her home about 300 yards distant to that store and had around her shoulders a green shawl. Some witnesses who testified for the Commonwealth were on the platform of the store at the time, and one of them testified to hearing defendant and a lady friend talking just inside the store and defendant's friend said in substance, "I wouldn't do it now there are too many people present." Defendant left the store and went to her home, but deceased continued to linger around it for some

twenty minutes and then started in the direction of the home of his companion who was going squirrel hunting with him, when he met defendant coming from her home towards the store at a point about half way between her home and the store.  The eye-witnesses then testified that when she got within five or ten feet of deceased she drew a pistol and shot him near the heart in the left side, from the effects of which he fell and while he was falling she fired a second shot, but missed him.  She then took the gun, which he carried on his left shoulder and unloaded, and threw it aside and went to his prostrate form and kicked him two or three times.  The Commonwealth also proved that about that time Dr. Gunn and others started to the place of the killing and that she shouted to the doctor, "I don't think the d—n thing is hurt very bad," and that proven statement of defendant is nowhere denied by her.

Defendant admits shooting the deceased at the time and place proven by the witnesses for the Commonwealth, but she claims that she did so in her necessary self-defense.  Her testimony as to what occurred immediately at the time of the meeting was, "Q. Tell the jury why you did not go more than about half way?  A.  I met up with Collins; I done heard the talk he had about me and I asked him about it, he said he hadn't handled the talk.  I says, 'Yes, you have.'  He says, 'Don't make me out a liar, or I'll knock your brains out.'  Q. What did he say he was going to knock your brains out with?  A.  He didn't say what, but he started to knock me down with the gun.  Q.  When he said that, tell what he did.  A.  When he said that he started up with the gun, so that is when the trouble occurred.  Q.  What did you do when he brought the gun up that way?  A.  I shot him.  Q.  How many shots did you fire?  A.  I fired two.  Q.  What did he do when you shot him?  A.  Why, he fell.  Q.  Now tell the jury why you shot him?  What made you shoot him?  A. Because he threatened to knock my brains out and started to hit me?"  She was partially corroborated by a Mrs. McIntosh, who was some thirty or forty yards away sitting on her front porch stringing beans, but both she and defendant were impeached by the Commonwealth as possessing bad moral character, though defendant supported her good reputation in that respect by three or four witnesses but who,

upon cross-examination, revealed that about the only person they had heard discussing defendant's reputation was Mrs. McIntosh, and since the date of the killing, and whose reputation for morality, as we have seen, was impeached with no witness sustaining it.

Defendant was allowed to testify that on the evening before the killing the next morning the deceased came into her house when she was alone and made indecent proposals to her, but he was driven away by her without accomplishing his purpose if he entertained such. She was also permitted to and did testify that on the same morning of the killing, but some time before, she was informed of extremely slanderous, and vulgar statements of the deceased made concerning her some time prior thereto. She was asked to detail those statements as told to her to the jury, but she declined to do so. The witness who told them to her was also permitted to testify as to that fact, but she did not tell, nor was she asked to tell, the actual statements supposed to have been made by the deceased concerning defendant; and there was much testimony in the record that deceased on a prior occasion had used scandalous language toward defendant and that she had been informed of that fact. Indeed, her above copied testimony shows that she had been informed as to such prior conversations of the deceased concerning her and that he then denied any such. She did not pretend that she shot him on account of any such slander but only in her necessary self-defense. She later introduced two witnesses who claim to have heard the slanderous statements of the deceased concerning her virtue and his relations with her, and she offered to prove by them the details of those conversations, which are too vulgar and shocking to insert in this opinion, and the court sustained an objection to them and declined to permit them to be introduced, and that ruling of the court is the only one of which complaint is made on this appeal.

Prior conversations by the deceased concerning the defendant, which form no part of the immediate transaction so as to be a part of the *res gestae* are never admissible in complete justification of a homicide. 30 C. J. 66. They are sometimes admitted in corroboration of the plea of self-defense when they amount to threats to do bodily harm to the defendant, upon the ground that they have a tendency to prove the state of feeling of the deceased toward defendant and thereby to support the

probability that he was the aggressor, but some courts do not allow their introduction for even that purpose, except in cases where the evidence of the killing is circumstantial and not established by eye-witnesses. C. J., *supra*, 191. Here the offered conversation of the deceased which the court rejected, concerned the relations between the deceased and the defendant and impugned her character for virtue and morality, and their ultimate effect on defendant could, in no event, be any greater than to enrage her and thereby reduce the homicide from murder to manslaughter. Without holding in this case that the words of the deceased, spoken some days before the homicide, were competent or incompetent for even that purpose, it is sufficient to say that defendant was convicted of manslaughter and not of murder. So that if we were to attribute the utmost legal effect to the rejected statements of deceased, it then appears that defendant got the full benefit of the mitigating effect of them had they been introduced. Having arrived at that conclusion it is unnecessary to extend the opinion in discussing the relevancy of that offered testimony, since as we have seen, the defendant got the benefit of all of the legal effect that it could have had upon the trial. Moreover, the jury were fully informed by defendant herself of the extreme vulgarity of the statements of the deceased concerning her when she declined to testify concerning them on account of that fact. To have them repeated before the jury after defendant so declined would not materially add to their effect and we are convinced that in no view of the case was defendant's substantial right prejudiced by the ruling of the court complained of.

No fair-minded person can read this record without concluding that defendant shot the deceased not in her necessary self-defense but because of some other motive, which may or may not have been his alleged slanderous remarks concerning her, and if for the latter she obtained by the verdict of the jury under the most favorable view all that the law entitled her to by reason thereof. Finding no error authorizing our interference with the judgment, it is accordingly affirmed.